UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARC SURACI, JR., a minor suing by and through his father and next friend, MARC SURACI, SR.,<br><br>*Plaintiff,*<br><br>*v.*<br><br>HAMDEN BOARD OF EDUCATION, BARBARA NANA, ROBIN RICCITELLI, ERIN BAILEY, and HOWARD HORNREICH,<br><br>*Defendants.* | Civil No. 3:17-cv-152 (JBA)<br><br>January 10, 2019 |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, a schoolchild with autism who received special education services at Hamden's elementary schools during the time period of the allegations in his complaint, brings this action through his father and next friend Marc Suraci, Sr. against the Hamden Board of Education and certain of its officials and employees: Barbara Nana (Spring Glen Elementary School Principal), Robin Riccitelli (Coordinator for Elementary Special Education for the Hamden Board of Education), Erin Bailey (Dunbar Hill School Principal), and Howard Hornreich (successor Principal of Spring Glen).

Plaintiff originally claimed violations of "the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794(a), *et seq.*, and the Constitution and laws of the United States and the State of Connecticut[,]" and further claims that certain conduct of Riccitelli was "extreme and outrageous and constituted the

intentional infliction of emotional distress upon the plaintiff in violation of Connecticut common law." (Compl. [Doc. # 1] ¶ 1, 27.)

Defendants argue that Plaintiff's ADA and Section 504 claims must be dismissed due to Plaintiff's failure to exhaust his administrative remedies under the Individuals with Disabilities Education Act. (Defs.' Mem. Law Supp. Mot. Summ. J. [Doc. # 23-1] at 5-6.) Plaintiff agrees that he did not exhaust these remedies and that his ADA and Section 504 claims are therefore precluded. (Pl.'s Br. Opp'n Mot. Summ. J. [Doc. # 26] at 1.) Accordingly, summary judgement will be entered in favor of Defendants on these claims.

With respect to Defendants Bailey and Hornreich, Plaintiff offers no factual allegations of any personal involvement by them related to deprivations of Plaintiff's rights. (*See generally* Compl.) Accordingly, summary judgment will be entered in their favor on all claims.

The only remaining claim is Plaintiff's IIED claim against Robin Riccitelli, (*see* Compl. ¶ 27), relating to her conduct on March 14, 2014. On that date, Riccitelli states that she "was called to Spring Glen Elementary School due to safety concerns regarding" Plaintiff, based on his indications that he wished to kill or harm other students or teachers, unsolicited notes from students who were hurt or scared by him, and a list written by Plaintiff of students and teachers labeled "Subjects for Weapon X[.]" (Ex. E (Riccitelli Aff.) to Defs.' Mot. Summ. J. [Doc. # 23-7] ¶ 8.) According to Riccitelli, "[d]ue to these and other incidents, it was decided that . . . it would be best for [Plaintiff] to have an emergency evaluation." (*Id.* ¶ 9.)

According to Plaintiff's father, on that day, after he dropped Plaintiff off, he received a call from the school telling him to return. (Ex. B (Marc Suraci, Sr. Dep.) to Defs.' Mot. Summ. J. [Doc. # 23-4] at 6.) After Mr. Suraci returned, he saw a fire engine and ambulance and was brought into a room with Ms. Riccitelli, who told him they believed his son was in crisis and needed to go to the

Yale psychiatric ward. (*Id.* at 7.) Riccitelli told Mr. Suraci that they were going to take Plaintiff there from school because he threatened to bring a weapon to school, showing Mr. Suraci Plaintiff's drawing of "Weapon X" and the student letters. (*Id.*) Mr. Suraci questioned how his son could be in crisis so soon after he left him when he appeared fine and told Riccitelli that "Weapon X" was merely a Marvel cartoon character, "like Spiderman[,]" not a weapon, reflecting Plaintiff's interest in Marvel characters. (*Id.* at 7-8.)

Riccitelli told Mr. Suraci "there's nothing you can do about it" and asserted that "[i]t's the law, and we're taking him." (*Id.* at 8.) Mr. Suraci told Riccitelli "[y]ou cannot put him in that ambulance[,]" offering, "if he's in crisis, I will take him[,]" and explaining that "[t]he last time he saw his mother was getting taken away in the ambulance[,]" so "[t]o do that would be so damaging." (*Id.*) Riccitelli responded "[t]here's nothing you can do about it." (*Id.*)

According to Riccitelli, because Mr. Suraci "would not agree to an emergency evaluation[,]" Riccitelli called 911 after consulting with the Acting Superintendent. (Riccitelli Aff. ¶ 10-11.) Plaintiff "was eventually brought to the main office at his father's request, but when [Plaintiff] reached the lobby the police arrived at the same time." (*Id.* ¶ 12.) Plaintiff began "pleading with [the police] not to take" his father away. (Suraci Dep. at 9.) Plaintiff "thought they were going to take" his father, and given "his issues with abandonment and watching his mother leave, he was very upset about" this. (*Id.*) Plaintiff told police "[p]lease don't take my father[,]" "[m]y mother died of cancer" and "[h]e's the only person I have; he's a good guy." (*Id.*)

It is undisputed that Riccitelli said nothing in Plaintiff's presence about either his father being taken away from him or about Plaintiff himself being taken involuntarily in an ambulance. (*See* Riccitelli Aff. ¶¶ 13-14.) Eventually a conversation was held with Riccitelli, Nana, Mr. Suraci,

and the police, and Plaintiff was permitted to leave school to go home with his father and was not transported involuntarily anywhere. (*Id.* ¶ 17.)

The Hamden Board of Education Policy 5131.21, on which Richitelli claims to have relied in her actions, states: "... [A]ny school employee who may have knowledge of a threat or act of violence must take the proper steps to report this information to the school principal who will, in turn, notify the appropriate school officials, the student's family and appropriate resource services." (Ex. A to Riccitelli Aff.)

Thus, the circumstance which Plaintiff claims to be extreme and outrageous was Riccitelli's summoning the ambulance to the school to transport Plaintiff involuntarily to a psychiatric hospital knowing Plaintiff's traumatic associations with ambulances and subjecting Plaintiff to great distress when Plaintiff interpreted the presence of emergency responders as coming for his father.

A claim for IIED must establish four elements. "It must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe." *Petyan v. Ellis*, 200 Conn. 243, 253 (1986).

This conduct falls well short of what reasonable minds could differ on as to whether it was extreme and outrageous. Moreover, there is no evidence Riccitelli's actions were "especially calculated to cause" Plaintiff "[serious] mental distress," *DeLaurentis v. City of New Haven*, 220 Conn. 225, 267 (1991) (internal quotation marks and citations omitted), even though they likely did. Riccitelli had a factual and reasonable basis for her actions, unlike the false accusation of a student's criminal conduct by a school official in *Zulawski v. Stancil*, No. CV05000203S, 2006 WL

4

2089470, at *4 (Conn. Super. Ct. July 14, 2006). Riccitelli did not humiliate, embarrass or mistreat

Plaintiff in any way, in contrast to the teacher in *Baird ex rel. Baird v. Rose* who mortified the

student in front of other students after learning of her depression diagnosis. *See* 192 F.3d 462, 472

(4th Cir. 1999). Plaintiff relies upon *Honaker v. Smith* for the proposition that one

> consideration in determining whether extreme and outrageous behavior exists is
> whether the plaintiff is particularly susceptible to emotional distress because of
> some physical or mental condition or peculiarity; behavior that otherwise might be
> considered merely rude, abrasive or inconsiderate may be deemed outrageous if the
> defendant knows that the plaintiff is particularly susceptible to emotional turmoil.

256 F.3d 477, 492 (7th Cir. 2001) (citations omitted). While that principle is true as a general

matter, the facts of *Honaker* bear little similarity to the facts here. In that case, the plaintiff alleged

that the defendant (who was both mayor and fire chief of the plaintiff's village) set fire to plaintiff's

home because the defendant "believe[d] the house's physical appearance [wa]s unsightly[.]"

Riccitelli did not abuse or misuse her authority as a school official or use it as a cloak for

misconduct, as it is undisputed that Board of Education Policy required her to take action to ensure

school safety under the circumstances as she understood them to be.

Whatever could be seen in hindsight as a less traumatic way to address Plaintiff's situation,

Riccitelli's conduct could certainly not be found to have been "beyond all possible bounds of

decency, . . . atrocious, and utterly intolerable." *Appleton v. Bd. of Educ. of Town of Stonington*, 254

Conn. 205, 211 (2000) (internal quotation marks and citation omitted).

Accordingly, Defendants' Motion for Summary Judgment [Doc. # 23] is granted in its entirety and the Clerk is directed to close the case.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 10th day of January 2019.